Clerk's Office
U. S. District Court
**FILED**
3/12/2020
Julia C. Dudley, Clerk
By: /s/ Susan Moody
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| KEITH CARLTON SAFEWRIGHT, </br></br> Plaintiff, </br></br> v. </br></br> ATSUMI CAR EQUIPMENT, INC, </br></br> Defendant. | Civil Action No. 7:18CV00605 </br></br> **MEMORANDUM OPINION** </br></br> By: Hon. Glen E. Conrad </br> Senior United States District Judge |

This matter is before the court on Atsumi Car Equipment, Inc.'s ("Atsumi's") motion for summary judgment on plaintiff Keith Carlton Safewright's claims of retaliation and interference under the Family and Medical Leave Act, as codified under 29 U.S.C. §§ 2601, et seq. ("FMLA"). This motion is fully briefed, and the parties appeared for a telephonic hearing on February 24, 2020.

**Background**

Atsumi hired Safewright in 2014 or 2015 to work as a Machine Operator at Atsumi's Wytheville, Virginia facility. ECF No. 27-2, Deposition of Keith Safewright ("Safewright Dep.") 13:19–22; Compl. ¶ 6. He usually worked the evening production shift, from 7:00 p.m. to 7:00 a.m. Safewright Dep. 16:1–10. At her deposition, Atsumi's Accounting and Human Resources Manager, Jae Graham, agreed that Safewright performed his work at a consistent level. ECF No. 27-1, Deposition of Jae Graham ("Graham Dep.") 26:8–15.

In 2015, Safewright began taking FMLA leave to take care of his daughter, who suffered from seizures. Safewright Dep. 14:11–16:4. In May 2016, Safewright requested FMLA leave to take care of his wife, who needed brain surgery related to a tumor. Id. 43:11–44:3, 48:24–51:3. Atsumi granted this request as well, and did so again in 2017. Id. 25:11–14.

Several witnesses, however, testified that Safewright's superiors at Atsumi thought he was misusing FMLA leave. One exchange from his former Team Leader Jimmy Dunford's deposition is illustrative. In this instance, Dunford recounted conversations with Atsumi's former production manager, Michelle Blankenship:

> Q. . . . Do you recall Ms. Blankenship ever discussing Mr. Safewright's FMLA usage?
>
> A. Yes.
>
> Q. What did you hear her say?
>
> A. I heard her say that he's lying, you know, probably ain't never happened, how are we going to get by without giving it to him.
>
> Q. And what was—when she was saying he's lying, what was your understanding, what was he saying that he was lying about, to your understanding?
>
> . . .
>
> A: His wife had been in the hospital with a brain tumor, and she didn't believe him, really.

ECF No. 27-6, Deposition of Jimmy N. Dunford ("Dunford Dep.") at 13:11–24; see also id. 23:7–24:3. Another Team Leader, Jeffrey Johnson, recalled similar conversations with Blankenship:

> Q. Did [Blankenship] ever talk about Mr. Safewright's FMLA usage?
>
> A. Yes.
>
> Q. In what way did they talk about it?
>
> A. That he was using—taking advantage of it.
>
> . . .
>
> Q. Did you hear her say that more than once?
>
> A. Yes.

> Q. How often did you hear Ms. Blankenship say that?
>
> A. Every time the conversation came up.

ECF No. 27-3, Deposition of Jeffrey Wayne Johnson ("Johnson Dep.") 47:20–48:11. Dunford also testified that he recalled a former plant manager telling Atsumi management to discourage employees from taking FMLA leave.

> Q. . . . [D]o you recall a former plant manager by the name of Yuzugami-san?
>
> A. Yes.
>
> Q. And did you ever observe or witness him to say anything about FMLA?
>
> A. Actually, he called the lawyer and told us that he did, about the FMLA and how to go about discouraging them or trying to get them to change their appointments so they could work more.

Dunford Dep. 16:18–17:2.

Atsumi did not discipline Safewright before he requested or took FMLA leave.[1] Graham Dep. 26:16–27:3. Afterwards, in March 2017, Atsumi issued Safewright a written warning that he had accumulated 8.5 "attendance points" for "[a]bsenteeism". ECF No. 25-2. Atsumi warned Safewright that his next unexcused absence would result in a "final warning." Id. After a final warning, Safewright would be subject to "immediate dismissal" if another incident occurred in the next six months.

Safewright testified that four of his attendance points should not have been assigned, and that he contested Atsumi's calculation at the time. Safewright Dep. 27:13–28:12, 38:13–40:1 ("Four days . . . shouldn't have been added."). When Safewright contested the number of points he had been assigned, his supervisors told him that they had looked into it, but that the count would

---

[1] Safewright also testified that a "bad part" was "slipped" into his batches of parts, but it is unclear how that would relate to his claims. Safewright Dep. 25:19–26:20.

3

not change.  Id. 54:18–55:22 ("Why would they put points on your balance? . . . Because they wanted to get rid of me for my FMLA.").  Safewright acknowledged at his deposition, however, that Atsumi used employees' fingerprints and a code to "clock in" at work.  Id. 42:3–12.  He said it was "possible" that he had forgotten to clock in with his fingerprint and code, "maybe one time." Id.

In June and July of 2017, Atsumi asked Safewright if he could transfer to day shifts, and offered him the position of inspector during the night shift so that production would not be affected as much when Safewright took leave.  ECF Nos. 27-9, 27-12, 27-15; Safewright Dep. 31:7–33:1.  Safewright declined the day shift because he needed to take care of his wife during the day.  Id.  Safewright emailed Graham on July 14, 2017, stating that he felt as if he was "being punished for asking for more FMLA leave[,] and the only way" he would "be there at 7pm" if he was "placed on [his] regular job."  ECF No. 25-6.  Graham responded that: "We expect you to show up for your regularly scheduled shift tonight at 7 pm."  Id.  At his deposition, Safewright recalled no response, and felt as if Atsumi had left him in "limbo."  Safewright Dep. 34:2–8.

In his opposition to Atsumi's summary judgment motion, Safewright attached an errata sheet that purported to add substantive "[a]dditional information" that Safewright "[f]orgot" at his deposition.  Specifically, Safewright states in his errata sheet that:

> Additionally, at the time of my termination, Ms. Graham insisted that I had to come back to work day shift.  When I asked about night shift, she said that I would not be able to utilize any FMLA leave if I came back on night shift.  My wife overheard this conversation on my phone.  I could not return to night shift if I was not allowed to use FMLA leave.

ECF No. 27-10.

Safewright's wife, Jessica Safewright, submitted a declaration to the same effect.  Jessica stated under penalty of perjury that she overheard a phone call from Graham to Safewright, "just

4

prior" to her husband's termination. ECF No. 27-11. She recounted that Graham told Safewright that "he could return to the night shift but that he would not be able to utilize FMLA ever again on the night shift." Id. Jessica also stated that Safewright "could not return to the night shift if his FMLA rights were going to be eliminated" because he "need[ed] to provide care to his family." Id. Likewise, Dunford testified that he heard the same statements from Graham, but that it had been on a voicemail, rather than a live telephone conversation. Dunford Dep. 18:13–19:22.[2]

Atsumi claimed that, thereafter, Safewright failed to report for five consecutive shifts in July 2017, and that he voluntarily quit. ECF No. 25-8. Subsequently, on July 27, 2017, Graham emailed Safewright: "You did not call in as per our company handbook advising us that you were unable to report to work. This leads us to the conclusion that you have ended your employment with Atsumi." Id. Safewright "assum[ed]" this email was a termination notice. Safewright Dep. 25:3–10. He conceded, however, that he missed five shifts waiting for the issue to be resolved. Id. 34:18–35:18. Safewright also could not say whether these absences were FMLA leave. Id. 57:19–24. Safewright's view of events was that Atsumi fired him because he refused take a position or a shift in which he would have to forfeit his right to FMLA leave. Id. at 25:3–10.

**Standard of Review**

A court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "a reasonable jury could return a verdict for the nonmoving party." Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012). A fact is material if it "might affect the outcome of the suit . . . " Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "In

---

[2] The exact date of the phone call is not clear on the record. Based on Safewright's statements at oral argument, the call allegedly occurred sometime between Safewright's July 14 email and his July 27 termination.

5

addition to construing the evidence in the light most favorable to . . . the non-movant," courts must also "draw all reasonable inferences in his favor." Vannoy v. Fed. Reserve Bank of Richmond, 827 F.3d 296, 300 (4th Cir. 2016). "Assessment of the credibility of [] statements, and any countervailing evidence, rests squarely within the purview of the trier of fact." Id. at 303.

**Discussion**

As is relevant here, the FLMA entitles eligible employees to "a total of 12 workweeks of leave during any 12-month period . . . [i]n order to care for the spouse, or . . . daughter . . . of the employee," if that spouse or daughter "has a serious health condition." 29 U.S.C. § 2612(C). The FMLA prevents interference with the exercise or attempted exercise of rights. 29 U.S.C. § 2615(a)(1). The FMLA also "contains *proscriptive* provisions that protect employees from discrimination or retaliation for exercising their substantive rights under the FMLA." Yashenko v. Harrah's NC Casino Co., LLC, 446 F.3d 541, 546 (4th Cir. 2006). "Known as 'retaliation' or 'discrimination' claims, causes of action alleging violations of these proscriptive rights arise under 29 U.S.C. § 2615(a)(2), which states that '[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.'" Id. (internal citations omitted).[3]

Unless there is direct evidence of discrimination, FMLA claims are analyzed under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800–06 (1973). See Yashenko, 446 F.3d at 550–51; Nichols v. Ashland Hosp. Corp., 251 F.3d 496, 502 (4th Cir. 2001). If Safewright "puts forth sufficient evidence to establish a prima facie case" and Atsumi "offers a non-discriminatory explanation" for his termination, Safewright "bears the burden of

---

[3] The court does not believe that an FMLA discrimination claim is different from a retaliation claim, and Safewright only addressed interference and retaliation in his summary judgment briefing. Thus, Counts I and II of Safewright's complaint are duplicative. The court analyzes them together as a "retaliation" claim.

establishing that the employer's proffered explanation is pretext." Nichols, 251 F.3d at 502. Pretext requires showing that the "decision to fire" him was "dishonest or not the real reason for [his] termination." Laing v. Fed. Exp. Corp., 703 F.3d 713, 722 (4th Cir. 2013); Haynes v. Waste Connections, Inc., 922 F.3d 219, 225 (4th Cir. 2019) ("In order to show pretext, a plaintiff may show that an employer's proffered nondiscriminatory reasons for the termination are inconsistent over time, false, or based on mistakes of fact.").

A prima facie case of retaliation under the FMLA requires showing that Safewright "engaged in protected activity, that the employer took adverse action against him, and that the adverse action was causally connected to the plaintiff's protected activity." Cline v. Wal–Mart Stores, Inc., 144 F.3d 294, 301 (4th Cir. 1998). A prima facie case of interference first requires showing that Safewright was entitled to FMLA leave. Rhoads v. F.D.I.C., 257 F.3d 373, 384 (4th Cir. 2001). The employee then must show (1) that Atsumi violated 29 U.S.C. § 2615 "by interfering with, restraining, or denying his or her exercise of FMLA rights"; and (2) that he "has been prejudiced by the violation." Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 89 (2002); Bosse v. Baltimore Cty., 692 F. Supp. 2d 574, 584 (D. Md. 2010).

The primary dispute on summary judgment is whether Safewright faced an actionable "adverse employment action" or was "prejudiced" under the FMLA. Atsumi argues that Safewright voluntarily quit, and Safewright responds that he was fired for discriminatory reasons

The court concludes Safewright has established a dispute of fact on this issue. The dispute is not whether he had missed eight days as of March 2017—Atsumi's fingerprint login system and code system for clocking in, along with Safewright's testimony that he had "maybe" only forgotten to clock in once preclude that. However, the dispute arises regarding whether all of those absences should have counted as attendance points, or whether those absences were properly excused as

FMLA leave. Safewright testified that only four of those absences should have counted against him, and Atsumi has not provided an accounting of each of his absences to show that they were unexcused.

A harder question is whether that dispute is material, that is, whether it would make a difference in Safewright's claims. Even if Safewright only had 4.5 attendance points accrued before he stopped coming in to work, Safewright does not dispute that he did not come into work for five straight shifts in July 2017. Safewright also could not say that those days should have been counted as FMLA leave. That would bring him to more than nine points, and therefore subjecting Safewright to termination under Atsumi policy, as he had been warned.

Safewright frames this period as "limbo" in waiting to hear whether he could return to his normal job role at 7 p.m. Atsumi relies on an email from Graham to Safewright telling him: "We expect you to show up for your scheduled shift tonight at 7 pm," ECF No. 25-6, and Safewright's own admission that he did not show up for five shifts afterwards. Viewing these violations of Atsumi policy out of context, it would seem possible that summary judgment is appropriate. See Laing, 703 F.3d at 718–22 (affirming grant of summary judgment where there was no direct evidence of discrimination and "no genuine dispute" that plaintiff had violated company policy). Yet two witnesses whose statements are properly before the court on summary judgment[4] allege that shortly before Atsumi fired Safewright, Graham told Safewright that he could return to his 7 p.m. shift and regular role, but that he could no longer use FMLA leave if he did so. On reply and at oral argument, Atsumi asked the court to discount these witnesses' statements. The court cannot do so here—that is an argument for the jury. See Vannoy, 827 F.3d at 303; Reed v. Buckeye Fire

---

[4] There is a side issue as to whether Safewright's errata sheet comports with the applicable Federal Rules. However, in the court's view, this issue is mooted by the fact that two other witnesses confirmed Safewright's account of his conversation with Graham as set forth in the errata sheet. Of course, the errata sheet will not be admissible at trial.

Equip., 241 F. App'x 917, 926 (4th Cir. 2007) (reversing grant of summary judgment after finding disputes of fact regarding reasons for employee's termination).

Viewing the evidence in Safewright's favor, the court believes that a reasonable jury could find that Safewright did not quit, but was waiting in "limbo" to see whether Atsumi would accommodate his FMLA needs. Accordingly, Safewright has created a material dispute of fact as to whether Atsumi fired him. Further, in contrast to Laing, Safewright has also offered enough evidence for a reasonable jury to find that Atsumi's decision was motivated by retaliatory animus, due to the proximity in time between Graham's alleged phone call and Safewright's termination, and the alleged prior statements by Atsumi management regarding FMLA leave.

## **Conclusion**

For the reasons stated, the court will deny Atsumi's motion for summary judgment.

The Clerk is directed to send copies of this memorandum opinion and the accompanying order to all counsel of record.

DATED: This __12th__ day of March, 2020.

                                    */s/ Glen E. Conrad*
                                      Senior United States District Judge